## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, Shawn Breault, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I have been a Special Agent with the DEA since February of 2010.  I was previously assigned to the DEA Los Angeles Field Division for eight years and have been assigned to the DEA's New Bedford Resident Office since 2018.  My responsibilities include the investigation of possible violations of federal law, including federal drug trafficking laws.  Prior to my assignment as a Special Agent, I attended and completed an approximately 19-week-long DEA Basic Agent Training Academy in Quantico, Virginia.  While at the DEA academy, I received training in drug enforcement investigations including, but not limited to, drug identification, surveillance, undercover operations, communications, interview and interrogation, confidential source handling, evidence handling, firearms, report writing and case development.  Prior to working for the DEA, I earned a Juris Doctor Degree in 2004.

2.      I have participated in various aspects of drug-related investigations.  I have participated in controlled purchases of illicit controlled substances utilizing confidential sources and undercover law enforcement agents and officers.  I have also conducted and coordinated electronic and physical surveillance of individuals involved in the illegal distribution of controlled substances.  I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations.   I have served and executed searches pursuant to drug related search warrants, coordinated and conducted

1

drug related wiretap investigations, and conducted arrests for violations of Federal narcotics laws. I have received extensive specialized training and experience in the field of controlled substance identification, investigation and enforcement.

3.      Based on my training, education, and experience, I am familiar with the manner and means commonly employed by drug traffickers and drug trafficking organizations to conduct their illegal activities, including purchasing, manufacturing, storing, and distributing controlled substances, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement.  I am also familiar with the terminology and slang commonly employed by drug traffickers.  I have observed and examined cocaine, cocaine base ("crack"), heroin, marijuana, methamphetamine, oxycodone, and fentanyl as well as other controlled substances.  I am aware of the prices commonly charged on the street for these substances, the method of packaging, and the jargon used in the drug trade.

4.      Based on my training, experience, and involvement in other criminal investigations, I know that individuals who distribute controlled substances often utilize motor vehicles in order to obtain quantities of controlled substances from their source of supply for distribution.  I also know that individuals who are engaged in the distribution of controlled substances utilize motor vehicles in order to transport controlled substances to various locations in order to meet with and distribute controlled substances to potential drug purchasers.

5.      Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of

2

illegal drugs.  Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement.  Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities.  Further, I know that individuals who distribute narcotics often utilize cellular telephones, and the text messaging capability included within their cellular telephones, as a method by which to arrange narcotics transactions.  I also know that individuals involved in the distribution of controlled substances frequently talk in code, either during conversations or while utilizing the text messaging function within their cellular telephone, as a means with which to avoid detection and apprehension by law enforcement.

6.     From my training and experience, I have learned that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia including, but not limited to, scales, plastic baggies, wrapping material, paper or plastic bundles, and zip lock bags, in residences and storage facilities.  Further, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such

records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep records to show balances due for drugs sold in the past and for payments expected as to the trafficker's supplier and the trafficker's dealer(s). Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions. There are many reasons why an individual will generally maintain records for long periods of time. The records will often seem innocuous because of their nature (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence.

7.     Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

8.     From my training and experience, I have also learned that it is also a generally

common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. Individuals who distribute controlled substances often use cash or readily transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. They may also use banks and wire companies, both foreign and domestic, to launder and transfer funds to co-conspirators. Records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

9.      In my experience, drug traffickers often possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

10.      Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances to set up shipments. I am aware that items such as cell phones and United States currency are often located on an individual's person.

11.      Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence.

12.     It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

13.     I am currently investigating Michael LAGASSE (hereinafter, "LAGASSE"), and others in connection with the distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1) (hereinafter, the "TARGET OFFENSE").

### Purpose of the Affidavit

14.     I submit this affidavit in support of an application for a criminal complaint charging that, on or about June 10, 2021, LAGASSE engaged in the sale and distribution of methamphetamines, in violation of 21 U.S.C. § 841(a)(1). Additionally I submit this affidavit in support of applications for search warrants for the residence located at 12 Devlin Avenue, Unit C, North Attleborough, Massachusetts (hereinafter, the "**TARGET PREMISES**") (as described more fully in Attachment A1);  and a black 2010 Nissan Maxima 4 door sedan, bearing Massachusetts license plate number 2HKY87, and with vehicle identification number 1N4AA5AP6AC833088 ("**TARGET VEHICLE**") (as described more fully in Attachment A2);

15.     Based on the instant investigation, agents have identified the **TARGET PREMISES** as LAGASSE's residence.   Based on multiple controlled purchases of methamphetamine that will be described in detail below, there is probable cause to believe that LAGASSE regularly stores controlled substances, specifically methamphetamine, as well as his

6

drug proceeds at this location.

16.     The facts of this affidavit come from my personal observations and review of records and reports, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

17.     Based on the information as detailed below, I submit that there is probable cause to believe that LAGASSE has committed the TARGET OFFENSE.  As will be discussed below, I submit that there is probable cause to believe that evidence of the TARGET OFFENSE, as set forth in Attachment B, will be located at the property to be searched, as described in Attachments A1 and A2.

## PROBABLE CAUSE

### Investigation Background

18.     Since July of 2020, DEA SAs, Task Force Officers ("TFOs") and assisting law enforcement agencies have been investigating a drug trafficking organization ("DTO") which is involved in distributing hundreds of counterfeit Adderall pills, which are suspected to be laced with methamphetamine (hereafter "counterfeit Adderall pills").  Our investigation has included the use of physical and video surveillance, debriefs of confidential sources, controlled purchases of hundreds of multi-hundred pill (and multi-hundred gram) quantities of counterfeit Adderall pills

by confidential sources and undercover officers, review of commercial database records and registry of motor vehicle records, precision location information (GPS/ping location) tracking of cellular telephones, GPS tracking the **TARGET VEHICLE**, and telephone "toll" record analysis.

19.    During the course of this investigation, I and other DEA SAs/TFOs have conducted debriefs of a confidential source[1] (hereafter "CS-1"), who has stated that LAGASSE is involved in distributing and selling counterfeit Adderall pills in multi-hundred pill quantities in the Southeastern MA area.   CS-1 has also stated that suppliers within the Target DTO use methamphetamine as an ingredient for counterfeit Adderall pills, and that suppliers within the DTO are using pill pressing machines to manufacture the counterfeit Adderall pills at locations not known to CS-1.

20.    Based surveillance conducted of LAGASSE to date, as well as location/GPS tracking of LAGASSE's cellular telephone and **TARGET VEHICLE**, I believe that LAGASSE's current address is the **TARGET PREMISES**.   Additionally, Massachusetts Registry of Motor

---

[1] CS-1 is currently working with DEA Investigators for the purpose of obtaining financial compensation.  CS-1 has a criminal history that includes prior arrests for larceny and theft, theft by deception, identity fraud, fraud, credit by false statement, credit card misuse, knowingly receiving stolen property, criminal trespassing, violation of a protective order, stalking, simple assault, drug and drug paraphernalia possession, vandalizing property, knowingly resisting arrest, shoplifting, drug distribution/manufacture, negligent operation of a motor vehicle, breaking and entering a building with intent to commit a felony, burglary, larceny from a disabled class, threatening and intimidating, intimidating race/color by assault, disturbing the peace, negligent operation of a motor vehicle, operating a motor vehicle after suspended license, and leaving the scene of an accident with an injured person. Based on my conversations with TFO Todd Boldy, I am aware that CS-1 has cooperated for various periods of time with DEA and Attleboro Police Department investigators in past investigations, dating back to 2016, during which CS-1 has provided reliable and accurate information.  During the course of the instant investigation, I have observed that CS-1 has also provided accurate and reliable information, which DEA Investigators have been able to independently corroborate, including as discussed within this affidavit.

Vehicle records indicate that the **TARGET VEHICLE** is registered to a "Rachel Anne Lagasse" at the **TARGET PREMISES**.

21.     As discussed in greater detail below, DEA investigators have coordinated for CS-1 and an undercover law enforcement officer, to conduct multiple controlled purchases of multi-hundred pill quantities of counterfeit Adderall pills from LAGASSE.  During certain controlled purchases, investigators have collected information and evidence to corroborate that LAGASSE has transported counterfeit Adderall pills from the **TARGET PREMISES** within the **TARGET VEHICLE** to the locations at which LAGASSE sold the drugs to the UC officer.  The below surveillance observations also corroborate that after the completion of the below controlled purchases, LAGASSE obtained the proceeds for the sale of the drugs, and subsequently returned to the **TARGET PREMISES**.

22.     Based on the information as discussed below, I submit that there is probable cause to believe that LAGASSE is involved in selling multi-hundred pill quantities of counterfeit Adderall pills, that LAGASSE has used the **TARGET VEHICLE** to transport the counterfeit Adderall pills and drug proceeds, and that LAGASSE has stored the drugs and drug proceeds at the **TARGET PREMISES**.  Therefore, I submit that there is probable cause to believe that evidence to be seized as listed in Attachment B will be located in within the **TARGET VEHICLE** and the **TARGET PREMISES**.

Controlled Purchase during the week of January 25, 2021

23.     On a date during the week of January 25, 2021[2], DEA Investigators met with CS-1, who arranged meet with LAGASSE later on the same date, in order to purchase approximately 100 counterfeit Adderall pills from LAGASSE at a price of $1,000.  TFO Todd Boldy and I instructed CS-1 to coordinate to meet LAGASSE at a public location in vicinity of North Attleborough, MA (hereafter the "meeting location").  Law enforcement officers searched CS-1's person and vehicle and did not locate contraband or weapons.  TFO Boldy then provided CS-1 with $1,000 official funds, as well as an audio transmitting device.[3]

24.     Concurrently, DEA and U.S. Department of Homeland Security Investigations ("H.S.I.") Investigators then established surveillance of the meeting location.  Investigators also maintained surveillance of and followed CS-1 to the meeting location, where TFO Boldy and I observed that CS-1 parked and waited for LAGASSE's arrival.  TFO Boldy and I then observed that a LAGASSE arrived at the meeting location in a yellow/gold Ford Fusion (bearing MA license plate VT41699) and parked next to the driver's side of CS-1's vehicle, such that the driver's side window of the yellow/gold Ford Fusion was next to the driver's side window of CS-1's vehicle. TFO Boldy and I then observed that both LAGASSE and CS-1 reached out of their respective driver's side windows and appeared to exchange items with each other.  Shortly

---

[2] The specific date of the controlled purchases and physical address of the meeting location have been omitted to protect the identity of CS-1, who as of the date of the discussed controlled purchases, has stated that CS-1 would be fear of reprisal or risks to CS-1's safety if CS-1's identity were discovered by members of the target drug trafficking organization.

[3] The audio transmitting device was provided to CS-1 for safety purposes. The audio transmitting device was not set to record, to protect CS-1's identity, and as CS-1 did not consent to be recorded on this occasion for fear of CS-1's safety.

thereafter, TFO Boldy and I observed that LAGASSE drove away from the meeting location, followed by surveillance units.

25.     TFO Boldy and I subsequently maintained surveillance of and debriefed CS-1. CS-1 stated that LAGASSE had arrived in the gold/yellow Ford Fusion and provided CS-1 with a sealed white envelope containing the approximately 100 counterfeit Adderall pills, for which CS-1 used the $1000 in official funds as payment for the drugs. CS-1 transferred custody of the sealed white envelope to TFO Boldy and me.  I opened the sealed white paper envelope, and observed that the envelope contained approximately 100 orange pills, which were wrapped in plastic wrapping.  Law enforcement officers again searched CS-1's person and vehicle, and did not locate any contraband.  I maintained care and custody of the approximately 100 counterfeit Adderall pills and packaging materials, and subsequently processed the evidence at the DEA New Bedford Resident Office ("NBRO") on the same date.  On a later date, the approximately 100 pills and packaging materials were submitted to the DEA Northeast Regional Laboratory ("NERL"), where the pills remain pending a chemical analysis by NERL chemists.

26.     Concurrently, Investigators followed LAGASSE, and observed that LAGASSE arrived at the parking lot of a Shaw's Grocery Store, located at 390 West Street, in Mansfield, MA.  There, TFO Edmond Desmarais observed that LAGASSE stopped in a lane of the parking lot, and that a brown Ford F150 (bearing Rhode Island license plate number 217576) pulled next to LAGASSE's gold/yellow Ford Fusion, such that the driver's side windows for each vehicle faced each other.  TFO Desmarais observed that the driver of the brown Ford F-150 (an

unidentified male subject) and LAGASSE appeared to exchange items through their respective driver's side windows, and then parted ways.

27.     Based on my training, experience, and knowledge of this investigation, I believe that this second meeting between LAGASSE and the driver of the brown Ford F150 was likely a second drug sale.  As observed above, the exchange of items between LAGASSE and the driver of the Ford F150 occurred in a similar manner to the drug sale between LAGASSE and CS-1. Both exchanges were completed in a brief period of time (suspected as a means to avoid attention from the public and law enforcement), occurred in a public parking lot, and involved the parties exchanging items through their vehicle windows before parting ways.

28.     Investigators then followed LAGASSE, and observed that LAGASSE picked up a child at a childcare business in Mansfield, MA, and later accessed the drive through of a Wendy's Restaurant in North Attleborough, MA. Investigators then observed that LAGASSE traveled to and parked the gold/yellow Ford Fusion in front of the **TARGET PREMISES**.  Surveillance of LAGASSE was subsequently terminated.

Controlled Purchase during the week of February 22, 2021

29.     On a date during the week of February 22, 2021, TFO Boldy and I met with and debriefed CS-1, who stated that CS-1 had arranged to purchase approximately 300 counterfeit Adderall pills from LAGASSE, for a price of $3,000, and at the same meeting location.  CS-1 also arranged for an Attleboro Police Department ("APD") officer, acting in an undercover capacity (hereafter the "UC officer"), to also be present at the meeting location during the pending

controlled purchase, under the guise that the UC officer would be the intended recipient who CS-1 was purchasing the 300 counterfeit Adderall pills for.  CS-1 also informed TFO Boldy that LAGASSE had to attend a chiropractor appointment prior to the pending drug sale.  Law enforcement officers searched CS-1's person and vehicle, and did not locate weapons or contraband.  TFO Boldy and I provided CS-1 with $3000 in official advanced funds for the pending controlled purchase, as well as an audio transmitting device for CS-1's safety[4].

30.     DEA Investigators then established surveillance in the vicinity of the meeting location, and subsequently also established surveillance at the Attleboro Chiropractic office at 175 N. Main Street, in Attleboro, MA.  TFO Boldy and I then followed CS-1 to the meeting location, where CS-1 parked and waited for the arrival of LAGASSE.  TFO Boldy and I subsequently observed that the UC officer arrived at the meeting location, and parked several parking spaces adjacent to CS-1's vehicle.  TFO Gabriel D'Agostino also observed that a gray 2011 BMW X5 SUV, bearing Massachusetts license plate 835PJ2 (hereafter the **"LAGASSE BMW")** (registered to Rachel Anne Lagasse, at the **TARGET PREMISES**), was parked in the vicinity of the Attleboro Chiropractic office.   TFO Michael Tryon then observed that LAGASSE leave the Attleboro Chiropractic building and drive away in **LAGASSE BMW**.  TFO Tryon and TFO D'Agostino subsequently followed the LAGASSE to the meeting location.

---

[4] The audio device was again not set to record to protect CS-1's identity, and as CS-1 did not consent to be recorded on this occasion.

31.     TFO Boldy and I observed that when the **LAGASSE BMW** arrived at the meeting location, LAGASSE parked next to CS-1's vehicle, such that the driver's side windows of each vehicle were near each other.  SA John A. Jackson observed that CS-1 and LAGASSE apparently handed items to each other.  Shortly thereafter, TFO Boldy and I observed LAGASSE drive away from the meeting location in the **LAGASSE BMW**.  TFO Boldy and I also observed that CS-1 walked to the UC's vehicle, and then returned to CS-1's vehicle, which CS-1 drove away from the meeting location.  TFO Boldy and I then observed that the UC officer drive away from the meeting location.  TFO Boldy and I then maintained surveillance of and debriefed CS-1.

32.     CS-1 stated that LAGASSE had arrived at the meeting location as the driver of the **LAGASSE BMW** and that LAGASSE had provided CS-1 with a sealed white envelope, which contained the approximately 300 counterfeit Adderall pills, for which CS-1 paid LAGASSE with $3000 in official advanced funds.  CS-1 stated that CS-1 talked to LAGASSE briefly, and then walked to the UC officer's vehicle and provided the UC officer with the sealed white envelope containing the counterfeit Adderall pills.  CS-1 then returned to CS-1's vehicle and drove away from the meeting location.  Law enforcement officers then searched CS-1's person and vehicle and did not locate any contraband.

33.     TFO Boldy and I then met with and debriefed the UC officer, who stated that after CS-1 and LAGASSE had met with each other at the meeting location, CS-1 walked over the UC officer's vehicle, and handed the UC officer a sealed white envelope.  The UC officer provided me with the white envelope, which I subsequently unsealed and opened.  TFO Boldy and I

observed that the white envelope contained the approximately 300 orange, oval shaped pills, which were collectively contained inside 3 Ziploc style bags. I maintained care and custody of the approximately 300 pills and packaging materials, and ultimately transported the evidence to the DEA NBRO. On the same date, TFO Desmarais and I utilized a Thermo Scientific TruNarc laser chemical/narcotics analyzer to conduct an electronic chemical analysis of one of the approximately 300 counterfeit Adderall pills, and observed that the analysis of the pill produced a presumptive positive result for the presence of methamphetamine. On a later date, the approximately 300 pills and packaging materials were submitted to the DEA NERL, where the pills remain pending a forensic chemical analysis.

34.     DEA Investigators also followed LAGASSE from the meeting location and observed that LAGASSE traveled to a Dick's Sporting Goods Store in N. Attleborough, MA. There, Investigators observed that LAGASSE met with an adult female and a juvenile female, and they went in to the Dick's Sporting Goods Store. Investigators later observed that the two female subjects walked back to the vicinity of the gray Infinity sedan, and that LAGASSE departed in the **LAGASSE BMW**. Shortly thereafter, surveillance of the car was briefly lost in the vicinity of Elm Street and Mount Hope Street, in North Attleborough, MA. Approximately 54 minutes later, TFO Todd Boldy observed that **LAGASSE BMW** was parked in the parking area in front of the **TARGET PREMISES**. Surveillance was then terminated.

Controlled Purchase during the week of March 22, 2021

35.     During the week of March 22, 2021, TFO Todd Boldy and I met with CS-1 and the

UC officer, prior to a planned controlled purchase of approximately 500 counterfeit Adderall pills

by the UC officer and from LAGASSE.  CS-1 had arranged for LAGASSE to meet with the UC

officer at the same meeting location later on the same date, in order to sell the approximately 500

counterfeit Adderall pills to the UC officer at a price of $4,000.  Law enforcement officers searched

CS-1's person and vehicle and did not locate contraband or weapons.  I then gave the UC officer

$4,000 in official funds for the pending controlled purchase.  TFO Boldy provided the UC officer

with an audio transmitting and recording device, which the UC officer carried during the controlled

purchase with LAGASSE.

36.     DEA investigators and Attleboro Police Department officers then established

surveillance at the meeting location.  TFO Boldy and I then maintained surveillance and followed

CS-1 and the UC officer (both in the UC officer's undercover vehicle) to the meeting location,

where the UC officer parked and waited for LAGASSE's arrival.  Investigators then observed that

LAGASSE arrive at the meeting location in the **LAGASSE BMW** and park next to the passenger

side of the UC officer's vehicle.  SA Jason Salas then observed that LAGASSE got out of the

**LAGASSE BMW**, walked over to the UC officer's vehicle, and reached into the passenger side

front window.  SA Salas then observed LAGASSE return to the car and drove away from the area.

Surveillance of LAGASSE was subsequently terminated.

37.     TFO Boldy and I followed the UC officer's vehicle from the meeting location to a nearby secondary location, where CS-1 and the UC officer were debriefed.  Law enforcement officers again searched CS-1's person and did not locate any contraband.  The UC officer stated that LAGASSE had arrived at the meeting location in the **LAGASSE BMW** and had ultimately provided the UC officer with a brown paper bag containing the approximately 500 counterfeit Adderall pills.  The UC officer then provided LAGASSE with the $4,000 in official funds, as payment for the counterfeit Adderall pills, after which LAGASSE drove away from the meeting location in the same car.

38.     The UC officer provided me with the brown paper bag containing the counterfeit Adderall pills.  I observed that the brown paper bag further contained 5 Ziploc style plastic bags, which each contained multiple orange, oval shaped pills.  I transported the drugs and packaging materials to the DEA NBRO later on the same date.  While at the NBRO, I weighed all the counterfeit Adderall pills, less the packaging materials, and observed that the pills cumulatively weighed approximately 167.1 grams.  On a later date, all of the pills and packaging materials were submitted to the NERL, where the pills remain pending a chemical analysis by NERL chemists.

<u>Controlled Purchase during the week of May 3, 2021</u>

39.     On a date during the week of May 3, 2021, DEA Investigators, along with H.S.I. Investigators, established surveillance in the vicinity of the Hayward Parking Garage, located at 33 Amherst Street, in Cambridge, MA, where TFO Desmarais observed that the **TARGET VEHICLE** was parked.  Later on the same date, SA Jason Salas observed that the **TARGET**

**VEHICLE** emerged from the Hayward Parking Garage, and drove away from the area.  DEA and H.S.I. Investigators subsequently followed the **TARGET VEHICLE** to the Lakeview Professional Building, located at 884 Washington Avenue, in Weymouth, MA.  SA Patrick Kelly observed that LAGASSE got out of the **TARGET VEHICLE** and walked into the vicinity of the Lakeview Professional Building.  Several minutes later, SA Kelly and SA Salas observed that LAGASSE walk from the Lakeview Professional Building, get into the **TARGET VEHICLE**, and drive away from the area.

40.     Investigators attempted to maintain surveillance of the **TARGET VEHICLE**, but ultimately lost surveillance of the vehicle while traveling on the I-495 highway, in the vicinity of the intersection of the I-495 highway and the I-95 highway.  Several minutes later, SA Raymond Greene and TFO Michael Tryon observed that the **TARGET VEHICLE** was parked in the parking space in front of the **TARGET PREMISES**.  DEA Investigators then continued surveillance of the **TARGET PREMISES** in anticipation of the controlled purchase discussed below.

41.     TFO Todd Boldy and I then met with CS-1 and the UC officer, prior to the planned controlled purchase of approximately 800 counterfeit Adderall pills by the UC officer and from LAGASSE.  CS-1 arranged for LAGASSE to meet with the UC officer at the meeting location, so that LAGASSE could sell approximately 800 counterfeit Adderall pills to the UC officer at a price of $5,600.  Law enforcement officers searched CS-1's person and vehicle and did not locate contraband or weapons.  TFO Boldy then gave the UC officer $5,600 in official funds for the

pending controlled purchase.  TFO Boldy provided the UC officer with an audio transmitting and recording device, which the UC officer carried during the controlled purchase with LAGASSE. Investigators then followed CS-1 and the UC Officer to the meeting location, where CS-1 and the UC officer both waited (in the UC officer's vehicle) for LAGASSE's arrival.

42.     Shortly thereafter, SA Raymond Greene observed that LAGASSE departed from the **TARGET PREMISES** and got in to the **TARGET VEHICLE**.  Investigators then followed LAGASSE to the vicinity of the meeting location.  TFO Boldy and I observed that LAGASSE parked at a nearby fitness center parking lot, which is adjacent to the meeting location.  TFO Boldy and I then observed that the UC officer go to the fitness center parking lot.  SA Greene observed that the UC officer parked near the **TARGET VEHICLE**, where the UC officer observed that LAGASSE was seated alone inside the **TARGET VEHICLE**.

43.     LAGASSE informed the UC officer that the approximately 800 counterfeit Adderall pills were contained inside a brown paper bag that was laying on the ground near the front of the **TARGET VEHICLE**.  CS-1 then retrieved the brown paper bag from the ground in front of the **TARGET VEHICLE** and provided the brown paper bag to the UC officer.  The UC officer then provided LAGASSE with the $5,600 in official funds, as payment for the approximately 800 counterfeit Adderall pills.  The UC officer then returned to the meeting location, where CS-1 and the UC officer then drove away from the meeting location in their respective vehicles.  Investigators then followed and debriefed CS-1 and the UC officer.

44.     Law enforcement officers again searched CS-1's person and vehicle, and did not locate contraband.  The UC officer confirmed LAGASSE had informed the UC officer that the counterfeit Adderall pills were on the ground near where the **TARGET VEHICLE** was parked. The UC officer stated that after CS-1 retrieved the brown bag containing the counterfeit Adderall pills, the UC officer paid the $5,600 to LAGASSE.   The UC officer stated that LAGASSE informed the UC officer that among the pills contained inside the brown paper bag, there were pills that were colored differently, which LAGASSE indicated were stronger (more potent) pills. The UC officer then provided TFO Boldy with the brown paper bag containing the counterfeit Adderall pills.  TFO Boldy and I observed that the brown paper bag contained 8 Ziploc style bags with multiple oval, orange pills in each, and that one of the bags contained pills that appeared to be brighter in color.  TFO Boldy then transported the counterfeit Adderall pills to the APD for further processing.

45.     At the APD, TFO Boldy used a Thermo-Scientific TruNarc laser chemical analyzer to conduct an electronic field test of one of the counterfeit Adderall pills.  TFO Boldy and I subsequently observed that the scan of the pill produced a presumptive positive result for the presence of methamphetamine.  TFO Boldy and I then processed the counterfeit Adderall pills and packaging materials into APD evidence storage.  On the following day, TFO Boldy removed the counterfeit Adderall pills and packaging materials from APD evidence storage, and transported the drugs to the DEA NBRO.  While at the NBRO, TFO Boldy and I observed that the weight of the approximately 800 counterfeit Adderall pills, less the packaging materials, was approximately

278.2 grams.  On the same date, I submitted the counterfeit Adderall pills and packaging materials to the DEA NERL, where the evidence remains pending a chemical analysis by NERL chemists.

46.     DEA Investigators and assisting law enforcement officers also maintained surveillance of the **TARGET VEHICLE** at the fitness center parking lot.  TFO Edmond Desmarais observed that LAGASSE went inside the fitness center, and remained inside for a period of time.  Later, TFO Desmarais observed that LAGASSE and a female child walked from the fitness center and departed in the **TARGET VEHICLE**.  TFO Desmarais and TFO Boldy (who had rejoined surveillance) attempted to follow the **TARGET VEHICLE**, but briefly lost surveillance of the vehicle for a short period of time.  Approximately 11 minutes later, TFO Boldy found the **TARGET VEHICLE** parked in the vicinity of the parking area for the **TARGET PREMISES**.  Surveillance was then terminated.

<u>Controlled Purchase conducted during on June 10, 2021</u>

47.     Prior to June 10, 2021, CS-1 had informed TFO Boldy the UC officer could contact LAGASSE at telephone number (401) 204-6666[5] (hereafter "LAGASSE's telephone"), in order for the UC officer to communicate directly with LAGASSE to arrange for the purchase of 100 counterfeit Adderall pills at a price of $800.  On June 10, 2021, the UC officer had a conversation through text messages with LAGASSE, as the suspected user of LAGASSE's telephone, during

---

[5] In May of 2021, I obtained subscriber records for LAGASSE's telephone from T-Mobile, and observed that LAGASSE's telephone is a cellular telephone subscribed to "Michael LAGASSE" at an address of "17 Amey St., Pawtucket, RI."

which the UC officer arranged to meet with LAGASSE at the meeting location in order to conduct the purchase of the 100 counterfeit Adderall pills.

48.     I have reviewed these text messages (which were written in English), and observed that on June 10, 2021, LAGASSE's phone sent a message to the UC officer's telephone stating (in part) "HMU later wen ur ready" [sic].  The UC officer later sent a text message to LAGASSE's telephone stating (in pertinent part) "Hey bro.  I am ready when you are."  LAGASSE's telephone then sent a message to the UC officer's telephone stating "I'll be in the North Attleboro area in about an hour if you want to catch me up around 915 930 I can meet you at the Wendy's."   On the same date, LAGASSE's telephone sent a text message to the UC officer's telephone stating "I'm almost home now" (which I interpret to mean that he was almost at the **TARGET PREMISES**) and "I'm grabbing that text me your ETA."  The UC officer replied "15 minutes." LAGASSE's telephone then sent a text message to the UC officer's telephone stating "Ok I'll be in black Maxima" (**TARGET VEHICLE**), and "I'll pull up opposite to u."

49.     Based on my training, experience, knowledge of this investigation, and the below surveillance observations, I believe that the above text messages consisted of LAGASSE stating that he (LAGASSE) would travel to the **TARGET PREMISES** to "grab" (obtain) the 100 counterfeit Adderall pills, and would then use **TARGET VEHICLE** in order to transport and sell the drugs to the UC officer.

50.     On the same date, DEA and H.S.I. Investigators established surveillance of the same meeting location (as discussed in prior controlled purchases), as well as the **TARGET**

**PREMISES**.  TFO Boldy and I also met with the UC officer, and provided the UC officer with $800 in official funds as well as a recording/transmitting device for the UC officer to carry during the controlled purchase.  TFO Boldy and I then followed the UC to the meeting location, where the UC officer parked and waited for LAGASSE's arrival.

51.     Upon arrival in the vicinity of the **TARGET PREMISES**, TFOs Edmond Desmarais and Gabriel D'Agostino observed that **TARGET VEHICLE** was parked in the parking area in front of the **TARGET PREMISES**.  Shortly thereafter, TFOs Desmarais and D'Agostino observed that the **TARGET VEHICLE** (later determined to be driven by LAGASSE) drove away from the **TARGET PREMISES**.  TFOs Edmond Desmarais and Gabriel D'Agostino then followed the **TARGET VEHICLE** to the meeting location, where SA Jason Salas and the UC officer observed that the **TARGET VEHICLE** parked next to the driver's side of the UC officer's vehicle, such that the driver's side front windows of each vehicle were in close proximity to each other.    The UC officer observed that LAGASSE was the sole occupant of the **TARGET VEHICLE**.  The UC officer observed that LAGASSE handed a clear plastic bag, containing multiple orange, oval pills, to the UC officer.  The UC office then provided the $800 in official funds to LAGASSE.  The UC officer and LAGASSE then talked briefly, before parting ways.

52.     I followed the UC officer to the Attleboro Police Department, where TFO Boldy and I debriefed the UC officer.  At the Attleboro Police Department, the UC officer and I counted the pills within the clear plastic bag and observed that there were approximately 100 pills.  The UC officer also utilized Thermo Scientific TruNarc laser chemical/narcotics analyzer to conduct

an electronic chemical analysis of one of the approximately 100 counterfeit Adderall pills. The UC officer and I observed that the analysis of the pill produced a presumptive positive result for the presence of methamphetamine. TFO Boldy then processed the drugs and packaging materials into evidence storage at the Attleboro Police Department for overnight secure storage and submitted the drugs and packaging materials to the DEA NERL on the following day.

53.   Investigators also maintained surveillance of LAGASSE and observed that LAGASSE drove the **TARGET VEHICLE** from the meeting location to a nearby Cumberland Farms gas station, where LAGASSE apparently purchased gas for the **TARGET VEHICLE**. Investigators then followed LAGASSE from the Cumberland Farms gas station to the **TARGET PREMISES**, where LAGASSE parked the **TARGET VEHICLE** in the parking area for the **TARGET PREMISES**. Surveillance of LAGASSE was then terminated.

<u>Recent Surveillance to Support Probable Cause.</u>

54.   On or about June 17, 2021, DEA Investigators began conducting video camera surveillance of the **TARGET PREMISES** and adjacent Devlin Avenue, in North Attleborough, MA. I have reviewed the video surveillance camera footage, and observed that on June 17, 2021, at approximately 7:53 p.m., the **LAGASSE BMW** was parked in the parking space in front of the **TARGET PREMISES.** During approximately the same time period, I observed that the **TARGET VEHICLE** arrived at the **TARGET PREMISES** and parked behind the **LAGASSE BMW**. I then observed that a male subject, suspected to be LAGASSE, got out of the driver's

24

side door of the **TARGET VEHICLE** and walked into the **TARGET PREMISES.**  I observed that on June 19, 2021, at approximately 5:39 p.m., the **TARGET VEHICLE** was parked in the parking space in front of the **TARGET PREMISES.**  During approximately the same time period, I observed that a male subject (suspected to be LAGASSE) arrived in the **LAGASSE BMW,** parked behind the **TARGET VEHICLE**, and then walked into the **TARGET PREMISES.**  I also observed that on June 21, 2021, at approximately 5:55 a.m., the **TARGET VEHICLE** was parked in the parking space in front of the **TARGET PREMISES,** and that the **LAGASSE BMW** was parked behind the **TARGET VEHICLE**.  At approximately the same, I observed that a male subject (again suspected to be LAGASSE) walked from the **TARGET PREMISES** and drove away from the area in the **LAGASSE BMW.**

55.     I reviewed video surveillance camera footage, taken by a video surveillance camera with a view of the **TARGET PREMISES** on June 23, 2021, and observed that at approximately 10:58 a.m., (Michael) LAGASSE walked into the parking area at the **TARGET PREMISES**, and then accessed **TARGET VEHICLE (**parked nearby adjacent the parking area) briefly, and then entered the **TARGET PREMISES.**  Minutes later, LAGASSE walked out of the **TARGET PREMISES,** got into the **LAGASSE BMW**, drove it over to where the **TARGET VEHICLE** was parked, and opened the hatch/trunk area of the **LAGASSE BMW**.  I then observed that LAGASSE appeared to remove items from the trunk of the **TARGET VEHICLE**, and put the items into the **LAGASSE BMW**.  LAGASSE then attempted to drive the **LAGASSE BMW** away from the **TARGET PREMISES** but was ultimately stopped and arrested by North Attleborough

Police Department (NAPD) Officers for a domestic incident before driving out of the parking area.  I later observed an unidentified subject walk from the **TARGET PREMISES** and returned the **LAGASSE BMW** back to the parking space in front of the **TARGET PREMISES**.

56.     On June 24, 2021, TFO Todd Boldy spoke to NAPD Detective Kevin McKeon, who informed TFO Boldy that on or about the same date, LAGASSE had called NAPD and requested an escort to retrieve property from the TARGET PREMISES, and that NAPD officers refused to provide such an escort.  Detective McKeon also informed TFO Boldy that after LAGASSE had been arrested, he was released on $1,500 bail, and was ordered by the (MA state) court to stay away from the TARGET PREMISES (and alleged victims) until the next scheduled court date of July 8, 2021.

57.     TFO Boldy and I reviewed video surveillance camera footage obtained from a camera with a view of the **TARGET PREMISES**, from the date of LAGASSE's arrest to June 28, 2021.  TFO Boldy and I did not observe LAGASSE return to or access the **TARGET PREMISES** during that period.  TFO Boldy and I observed that on June 24, 2021, TFO Boldy and I observed a female subject (suspected to be Rachael LAGASSE) removed what appeared to be a shopping style bag from LAGASSE'S BMW, and apparently carried the bag into TARGET PREMISES.  TFO Boldy and I observed that on June 25, 2021, an unidentified female subject arrived at the TARGET PREMISES in a dark colored SUV, removed what appeared to be boots and a shopping bag from the steps in front of the front door of the TARGET PREMISES, and then drove away from the area.  From the same video camera footage, TFO Boldy and I have also

26

observed that the **TARGET VEHICLE** has apparently remained parked on Devlin Avenue adjacent to the **TARGET PREMISES** parking area, and that **LAGASSE'S BMW** has apparently remained parked in one of the parking spaces in front of the **TARGET PREMISES** since LAGASSE's arrest.  Based on the above information, I suspect that LAGASSE has remained away from the **TARGET PREMISES** since his arrest, pursuant to the court's order to remain away from the premises.

58.     Based on my training, experience and knowledge of this investigation, as well as the information contained in this affidavit, I believe that the above video surveillance camera observations support that LAGASSE continued to regularly use the **TARGET VEHICLE** until the time of his arrest.  Given the previously discussed information which supports that LAGASSE has used the **TARGET  VEHICLE** to commit the TARGET OFFENSE on several occasions, I believe that LAGASSE has continued to use this vehicle and will continue to do so to commit the TARGET OFFENSE; namely, selling counterfeit Adderall pills.  Therefore, I submit that there is probable cause to believe that the evidence to be seized as detailed in Attachment B will be found within the **TARGET VEHICLE.**

59.     Based on my training, experience and knowledge of this investigation, I submit that the information and evidence detailed in this affidavit supports probable cause to believe that LAGASSE has committed the TARGET OFFENSE.  Specifically, LAGASSE has sold counterfeit Adderall pills, including amounts in excess of approximately 50 grams, on five occasions (via the above five controlled purchases) during the period from January of 2021, to June of 2021.  The

above information and evidence also corroborates that during two of the controlled purchases, LAGASSE used the **TARGET VEHICLE** to transport and sell the counterfeit Adderall pills to CS-1 and or the UC officer, and that LAGASSE has used the **TARGET VEHICLE** to transport counterfeit Adderall pills directly from the **TARGET PREMISES** to the meeting location for sale of the drugs to the UC officer.  The above information and evidence also supports probable cause to believe that after the completion of several of the controlled purchases involving CS-1 and the UC officer, and when LAGASSE was in custody of the proceeds from the sales of the counterfeit Adderall pills, LAGASSE ultimately returned to the **TARGET PREMISES**.  The above information and evidence also supports probable cause to believe that LAGASSE has used LAGASSE's telephone to make drug trafficking communications, such as communicating with the UC officer to arrange for the sale of counterfeit Adderall pills the UC officer.

60.     From my training and experience, I have learned that drug traffickers often keep their digital media devices, including cellular telephones, laptops, computers, tablets, and hard drives, within their residence, or within their vehicle(s), for easy access to use to communicate with their drug trafficking network.  As such, I believe the above information/evidence supports probable cause to believe that LAGASSE maintains (at least) LAGASSE's telephone on his person, or within the **TARGET PREMISES** or the **TARGET VEHICLE.**  From my training and experience, I have also learned that drug traffickers often store and retain drugs and drug proceeds at their residences, as doing so provides the drug trafficker with direct access, security and control of the drugs and or proceeds.  In the instant case, there is probable cause to believe that LAGASSE

has retrieved counterfeit Adderall pills from and or returned proceeds to the **TARGET RESIDENCE** on multiple occasions over an approximately 5 month period, and that in doing so, LAGASSE has used the **TARGET VEHICLE** to transport the counterfeit Adderall pills. Therefore, I submit that the above information and evidence supports probable cause to believe that LAGASSE regularly retains drugs and drug proceeds at the **TARGET PREMISES**, and that there is probable cause to believe that drugs, drug proceeds, and or the evidence to be seized as listed in Attachment B would be found in the **TARGET PREMISES** and the **TARGET VEHICLE.**

<u>Drug Traffickers' Use of Residences and Electronic Devices Generally</u>

61.     Based upon my training, experience and conversations with other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences and locations of operation:

    a.   Controlled substances.

    b.   Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

    c.   Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental

29

properties and/or storage units.

d.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

e.  Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

f.  Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g.  Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i.  Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

j.  Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

62.     Based upon my training and experience, I am aware that it is generally a common practice for drug traffickers to maintain records relating to their drug trafficking activities in their residences.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

63.     Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

64.     Based upon my training and experience, I am aware that it is generally a common practice for traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

65.     Furthermore, drug traffickers may make use of wire transfers, cashier's checks, and

money orders to pay for controlled substances, or to launder proceeds.  Drug traffickers also often

maintain currency counting machines at their residence, to aid in counting their drug proceeds.

Many experienced drug traffickers will often engage in money laundering to conceal the source of

their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry

and precious metals.  In other instances, drug traffickers will combine cash from their drug

trafficking with cash deposits from other legitimate business activities in an attempt to hide their

illegal conduct.  Evidence of such financial transactions and records relating to income and

expenditures of money and wealth in connection with drug trafficking would also typically be

maintained in residences.

        66.    Based upon my training and experience, I am also aware that drug traffickers often

try to hide cash and sensitive documents related to their drug trafficking and money laundering

activities in safes or other containers so that other individuals who are at their residence do not

discover these materials.

        67.    From my training and experience, I have learned that many drug dealers receive

their drugs through commercial carrier and U.S. mail parcels and keep mailing labels and airbills

both used and unused in their residence for future use.  Additionally, such drug traffickers often

send the proceeds of their drug sales via commercial carrier and or U.S. mail delivery, Western

Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs.  Such

individuals will often maintain records of these transactions for a period of time in case there is a

later dispute concerning what funds were transmitted and when.

68.     During the course of residential searches, I and other agents and officers have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the TARGET OFFENSE.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

69.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.  In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal

identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences.  Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences.  As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

70.     Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the

location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

71.     Search and seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.  Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

72.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and

updates to online social-networking websites; keeping their calendars; arranging for travel; storing

pictures; researching topics related to drug trafficking; and accessing their bank, financial,

investment, utility, and other accounts online.  Additionally, many cellular phones today have a

GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide

valuable evidence as to the locations where drug traffickers meet with coconspirators, including

their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS

data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank

accounts, and conceal their drug proceeds.

73.     Based upon my training and experience, and information provided to me by others

involved in the forensic examination of computers, I know that electronic data on cellular

telephones can be stored in a variety of methods, including, but not limited to, within the memory

of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as

memory cards.  I also know that electronic data can often be recovered months or even years after

it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true

because:

> a.  Electronic files that have been downloaded to a storage medium can be stored for
>     years at little or no cost.   Furthermore, when users replace their electronic
>     equipment, they can easily transfer the data from their old device to a new one.
>
> b.  Even after files have been deleted, they can be recovered months or years later
>     using forensic tools.  This is so because when a person "deletes" a file on a device,
>     the data contained in the file often does not actually disappear; rather, that data
>     remains on the storage medium until it is overwritten by new data, which might not
>     occur for long periods of time.  In addition, the device's operating system may also
>     keep a record of deleted data in a "swap" or "recovery" file.

    c.   Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.   This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.   It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

    d.   Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."   The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

74.    The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B.  If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

75.    Based on the foregoing, there is probable cause to believe that evidence of the commission of the TARGET OFFENSE, more specifically, the items set forth in Attachment B, will be found in the **TARGET PREMISES**, described in Attachment A1 and the **TARGET VEHICLE** as described in Attachment A2.

## CONCLUSION

76.     I submit that this affidavit supports probable cause for a warrant to search the **TARGET PREMISES** and the **TARGET VEHICLE** as described in Attachments A1 and A2, respectively, and to seize the items described in Attachment B.

77.     Based on the foregoing facts, I submit there is probable cause to believe that on or about June 10, 2021, LAGASSE, did knowingly and intentionally distribute a mixture and substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Respectfully submitted,

Shawn Breault
Special Agent
U.S. Drug Enforcement Administration

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date:  June 28, 2021

HON. MARIANNE B. BOWLER
United States Magistrate Judge

38

38

## ATTACHMENT A1

*Property to be searched*

The property to be searched is 12 Devlin Avenue, Unit C, in North Attleborough, Massachusetts (hereinafter, the "**TARGET PREMISES**").  The **TARGET PREMISES** is located within a two-story, three-unit gray, wood paneled building, with white trim on the windows, doors and edging of each unit.  The **TARGET PREMISES** consists of the unit on the Northwest end of the three-unit building, and is gray in color, with white trim.  The **TARGET PREMISES** has a red front door, which faces a parking area which is directly adjacent to Devlin Avenue.  The letter C, marked in black writing on a white background, is attached to the **TARGET PREMISES** directly adjacent to the front door.

A photograph of the exterior of **TARGET PREMISES**, the red door on the left of the first photograph and the right of the second photograph, is below:

39





## ATTACHMENT A2
*Property to be searched*

The vehicle to be searched is described as a black, 2010 Nissan Maxima 4 door sedan, bearing Massachusetts license plate number 2HKY87, vehicle identification number (VIN) 1N4AA5AP6AC833088, and registered to Rachel Anne Lagasse at 12 Devlin Avenue, Unit C, North Attleborough, MA  02760 ("**TARGET VEHICLE**").  A photograph of the exterior of **TARGET VEHICLE** is below:



**ATTACHMENT B**

*Property to be seized*

1.      Controlled substances including, but not limited to methamphetamine;

2.      Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, zip lock bags;

3.      Devices used to communicate with other drug traffickers or buyers, order controlled substances over the Internet, or track packages containing controlled substances, including computers, cellular telephones and pagers; electronic equipment used for counter-surveillance such as scanners, police radios or monitors, surveillance cameras and monitors, anti-bugging devices and devices used to detect the presence of wiretaps, recording devices or transmitters, and/or receipts or literature describing same;

4.      Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, address books (written or electronic / digital media);

5.      Currency or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); any currency with serial numbers that match currency provided by law enforcement to the CS for the purchase of illicit drugs; prepaid debit cards and gift cards;

6.      Materials evidencing the receipt of large amounts of cash including bank statements and related records, passbooks, letters of credit, money drafts, cashier's checks, bank checks, checkbooks, tax returns, loan statements, tax return work papers, escrow files, Forms 1099, wire transfer records, and other items evidencing the obtaining, secreting, transfer, concealment, and expenditure of money related to drug trafficking activities;

7.      Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency;

8.      Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles or trucks purchased with cash or cash equivalents;

9.      Photographs, negatives, video tapes, films, undeveloped film and the contents therein, and slides depicting the subjects of the investigation and their criminal

2

associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

10. Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subject of the investigation and her criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

11. Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances;

12. Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

13. Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers;

14. Credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

15. Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

16. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. any stored records otherwise authorized by this warrant, as identified above;

   b. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   c. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect

3

malicious software;

d.  evidence of the lack of such malicious software;

e.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

f.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

g.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

h.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

i.  evidence of the times the COMPUTER was used;

j.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

k.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

l.  records of or information about Internet Protocol addresses used by the COMPUTER;

m.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

n.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and

4

other magnetic or optical media.